FARMERS' LOAN & TRUST CO. v. OREGON & W. T. R. CO., (CONGDON, Intervener.)

(Circuit Court, D. Oregon. November 3, 1893.)

No. 1,896.

1. SALE—RAILROAD BONDS—COUPONS.
     A contract for the sale of railroad bonds *held* to include overdue coupons, where it appeared that the contract contemplated a purchase of the railroad free from all indebtedness, and that the purchase of the bonds was merely a means to that end.

2. SAME—BONA FIDE PURCHASER.
     One who took an assignment of such coupons, with knowledge of the contract, *held* not to be a bona fide purchaser.

In Equity. Bill by the Farmers' Loan & Trust Company against the Oregon & Washington Territory Railroad Company to foreclose a mortgage. Chester A. Congdon intervenes. Petition denied.

C. E. S. Wood, for petitioner.

Lewis L. McArthur and Richard C. Dale, for C. B. Wright.

BELLINGER, District Judge. Chester A. Congdon files his petition of intervention in this suit, claiming to be the holder and owner, for value, of 5,866 coupons of the consolidated first mortgage bonds of the defendant company, of the par value of $30 each. These coupons matured on July 1, 1890, and January 1, 1891. There was a decree of foreclosure heretofore made in this suit, of the mortgage in question, but such decree did not provide for the payment of any coupons maturing prior to January 1, 1891, or in any way refer

to such coupons. The petitioner prays that, as the owner of these coupons, he be allowed to participate in the proceeds of the sale had under the decree of foreclosure, and that the decree be modified accordingly. The answer to this petition denies that the petitioner is a bona fide holder of the coupons in question, and alleges that on the 27th day of February, 1891, G. W. Hunt was the owner of the bonds to which these coupons were attached, and then sold such bonds to C. B. Wright for a valuable consideration paid by Wright; that the petitioner knew of such sale, and, having such knowledge, accepted such coupons from Hunt without consideration, knowing that Hunt had wrongfully detached them from the bonds after the sale to Wright, and in fraud of the latter's rights; that Wright is the owner of the coupons mentioned in the petition. The ownership of these coupons is the question to be decided.

On the 27th day of February, 1891, G. W. Hunt was the president, manager, and in fact owner, of the Oregon & Washington Territory Railroad, and of all its bonds, except 1,142 of a first issue on what is known as the Pendleton Division, already sold, and then owned by C. B. Wright. On that day he entered into the following agreement with Wright:

"Philadelphia, Pa., Feb. 27, 1891.

"It is hereby agreed between C. B. Wright, of Philadelphia, Pa., and G. W. Hunt, of Walla Walla, Wash., as follows: The said Hunt agrees to deliver, and the said Wright to take, all of the issue of bonds of the Oregon & Washington Territory R. R. Co., (except 1,142 bonds of the first issue on the Pendleton Division, already sold,) at 90 per cent. of their par value, at $20,000 per mile, or at a purchase price of $18,000 per mile. There are said to be 111 miles of said road, but the exact mileage shall be determined by actual measurement, by two competent parties, one · to be selected by each of the parties to this contract. If said road is not in a fair and reasonable good condition, according to the standard of western railroads, the said Hunt agrees to put it in such a condition, to the reasonable satisfaction of the president and chief engineer of the Northern Pacific, at his own expense. This provision applies only to roadbed, not to stations or other improvements. The said Hunt further agrees to deliver to said Wright, without additional compensation, 51 per cent. of the capital stock of said corporation.

"It is further agreed that said Hunt shall be paid for all the rolling stock of said corporation or of said Hunt, and used by said corporation, an additional sum, to be determined by T. F. Oakes, president of the N. P. R. R., and G. W. Hunt. Also, that the said Hunt shall be allowed to build and complete, ready for the rolling stock, about 42 miles of extension of said road, as follows:

"About 18 miles to the Snake river.
"    12   "    to the near Conalle.
"    12   "    to the near Milton.

—All in Washington and Oregon, whenever the same shall be built, and at such price as may be agreed on with the said T. F. Oakes.

"The terms of payment to be as follows, $75,000 cash, which immediate payment shall be further secured by said Hunt pledging with said Wright, as collateral security, until the second payment is made, all the capital stock of said corporation remaining and belonging to said Hunt, over and above the 51 per cent. aforesaid.

"$800,000 to be paid on Friday, April 17th, 1891.
"$300,000   "   "   "   "  July 1st, 1891.
"$400,000   "   "   "   "  September 1st, 1891.

—And the balance on December 1st, 1891. Deferred payments to draw interest at 6 per cent.

"It is further agreed that said road shall be delivered clear and free of floating (or unsecured) indebtedness, and that the said Hunt, as president of said corporation, shall lend his best efforts and his time to the reorganization of said corporation, as the said Wright or his successors shall direct.

"In the presence of                              C. B. Wright.   [Seal.]
  "C. E. S. Wood.                                 G. W. Hunt.     [Seal.]
  "C. B. Wright, Jr.                              C. B. Wright."

While this agreement does not, in exact terms, state that the sale includes all the coupons of all the bonds not already owned by Wright, such is its effect. The provisions that Hunt is to deliver, and Wright take, "all of the issue of bonds," except 1,142 already owned by Wright; that the road shall be delivered clear and free of floating or unsecured indebtedness; that the bonds are to be taken at 90 per cent. of their par value, at $20,000 per mile, "or at a purchase price" of the road "of $18,000 per mile," and the further provision for the purchase of all the rolling stock of the road and of Hunt, and of 42 additional miles of road to be built by Hunt, at prices to be determined by T. F. Oakes, president of the Northern Pacific Railroad Company,—show that this was intended to be a purchase of the road free from all indebtedness, and that the purchase of the bonds of the road was merely a means to that end.

The remaining question, then, is, did Congdon, the petitioner, purchase these coupons, as claimed by him, under circumstances that entitle him to the protection of a bona fide purchaser?

At the time the agreement between Hunt and Wright was made, the bonds in question were deposited as collateral security for Hunt's debts with the Park National Bank and J. Kennedy, Tod & Co., both of New York. Of the overdue coupons now in controversy, 2,388 were at the former bank, and 3,478 at the bank of J. Kennedy, Tod & Co. The collaterals held by the Park National Bank were, in greater part, to secure Ladd & Tilton. All of them were so held in the first instance, but subsequently, at different times, at Hunt's request, portions of them were agreed to be held to secure certain other creditors, whose debts were pressing. These bonds and coupons are still in the Park National Bank. The 3,478 coupons at the bank of J. Kennedy, Tod & Co. were delivered to C. E. S. Wood, upon his order, but on account, presumably, of Mr. Congdon, whose attorney Mr. Wood now is. These latter coupons were offered in evidence on this hearing in behalf of Mr. Congdon. The coupons in question were overdue at the time of the agreement between Hunt and Wright. It is claimed for Congdon that they had been detached from the bonds prior to that time, and that he purchased them in good faith, without notice of Wright's claim. and in pursuance of an agreement with Hunt theretofore had, prior to the latter's agreement with Wright. In his testimony, Hunt does not state when the coupons were cut off, further than that it was done by his order at different times, by the parties who held the bonds; that he had ordered them cut off whenever they were due. The witness King, loan clerk of the Park National Bank, testifies that he does not know how or when the coupons belonging to the bonds in that bank were

cut from the bonds; that it might have been done while he was away from the bank for a day, sick, and he would know nothing of it; and that he does not know who would have knowledge of it, unless it is Baldwin, assistant cashier of the bank. Baldwin testifies that he knows nothing on the subject, and does not know who would know, unless it is King. William S. Tod, of the banking firm of J. Kennedy, Tod & Co., testifies with particularity to the receipt of bonds at different times from Hunt, and to their delivery, giving dates and amounts, but knows nothing as to the cutting off of coupons. A letter is in evidence from Ladd & Tilton to the Park National Bank, dated April 28, 1891, in which the writer says that "early in 1891 Mr. Wilcox cut off some O. & W. T. consolidated coupons,, and left them with you," and they request the bank to forward these coupons by registered mail. Mr. Wilcox was the agent of Ladd & Tilton. He was a witness for the petitioner, but was not examined as to the cutting off of these coupons. On the 21st of May, 1892, Mr. W. S. Ladd, of Ladd & Tilton, answering a letter from Wright, says, "I understood from Mr. Hunt that, when the bonds were delivered to you, it would be with the coupons cut off up to that date, and so the coupons were cut off." From this it seems that the coupons attached to bonds in the Park National Bank were not detached at the time of the sale of these bonds to Wright, February 27, 1891, but that thereafter Hunt represented to Ladd & Tilton that the bonds sold to Wright were to be delivered with the coupons cut off up to that date, and that thereupon the coupons were cut off. What is true of these coupons is, no doubt, also true of those in the custody of J. Kennedy, Tod & Co. The matter of the cutting off of these coupons is not decisive of the rights of the parties. It is important as tending to show good faith, or want of good faith, on the part of Hunt in the transaction; as tending to show that the coupons were not cut off as fast as they matured, in obedience to a direction from Hunt to that effect, as he tries to have it appear, but that they were cut off after the sale to Wright, and in order that the bonds sold might be delivered to Wright without the attached coupons.

Hunt testifies that he had been "carrying" these coupons, and that he means by this that he was paying the interest on the bonds out of his own pocket, and that Wright knew this. He further explains this statement by saying, "The bonds belonged to me, and I borrowed moneys, and put up the bonds as collateral security to the parties I owed." But this would not alter his relations to the coupons. It has no bearing upon the question of sale to Wright, which, so far as such "carrying" of the bonds is concerned, may as well have been of coupons as of bonds.

Hunt's assignment of coupons to Congdon is dated April 2, 1891, —more than a month later than the agreement between Hunt and Wright. The consideration stated is $120,000. This $120,000 was a pre-existing debt due Congdon from Hunt. Notwithstanding the claim made that Congdon took these coupons on this debt in

good faith, he presented an order from Hunt to Wright for this $120,000, which he sought to have paid out of the moneys which Wright had agreed to pay Hunt for these bonds, and he claimed, and wrote to Wright at length to convince him, that this order operated as an assignment of so much of the moneys due from Wright under the latter's contract with Hunt. In other words, Congdon now claims ownership of these coupons as a purchaser of them in good faith on his debt, after having tried to avail himself of Wright's contract of purchase to get such debt paid out of the price agreed to be paid for these coupons, and the bonds to which they were attached. Wright refused to accept the order for the reason that he was compelled to pay the amount of his obligation to the creditors of Hunt who held the bonds of the company. The assignment of coupons to Congdon is dated April 2, 1891. On the 16th of the same month, Wright wrote to Congdon, saying that he had not had an opportunity, until that date, to look over the document handed him (Wright) by Congdon, in New York, "some days ago." The document referred to was a copy of Hunt's order to Wright to pay Hunt's debt to Congdon out of the payments due Hunt under the February contract. Wright explains his position in his letter,—that he must "corral" the bonds of the Oregon & Washington Territory, as these "govern the road," and he does not know, and cannot know, what amount will be due Hunt, until these bonds are corraled,—until he knows what amount "has to be advanced to cover the amount of bonds on the road." This letter to Congdon also says, "I understand you have seen a copy of the contract,"—the contract between Wright and Hunt. Congdon answered this letter on May 2d, stating that, at the time he took the order from Hunt, he had seen a copy of the contract referred to. He insisted in this letter that Hunt's order entitled him to receive $120,000 from Wright out of the price Wright was to pay Hunt under their agreement. He did not, in this letter, make any reference to coupons, although the letter to which this was an answer had explained Wright's refusal to accept Hunt's order by stating that he (Wright) was under the necessity of "corraling" the indebtedness which "governed the road." If Congdon had, or supposed he had, these coupons, at that time, as security for the debt for which the order was given, he would have mentioned the fact. These coupons comprised a part of the debt for which the road was held, and would therefore be what Wright was trying to "corral." With these coupons, Congdon would be among the favored class of Hunt's creditors. When Wright said to Congdon, "I cannot pay your order, because I must pay those whose debts are liens upon the road," it is incredible that Congdon would, if he had at the time a contract for these coupons, write at length in reply, and endeavor to convince Wright that he should pay the order, and yet omit to inform him that he held these coupons, which made his debt a lien on the road. Congdon has not testified in the case, but his correspondence in evidence leaves nothing to be said upon the question of his good faith

in the matter of the claim made in his petition. The assignment of April 2, 1891, or any previous promise of Hunt made in consideration of Congdon's antecedent debt, does not give the latter the better right, as against Wright, who gave his acceptances for large sums of money, which he subsequently paid, without notice of the claim now made, in discharge of the debts for which the bonds and coupons in question were pledged.

I conclude that, by the agreement between Hunt and Wright, the latter became the owner of the coupons in controversy; that such was the intention of the parties, and is the effect of their agreement; that the detaching of these coupons was an afterthought on the part of Hunt and the petitioner; that the latter took his assignment subsequent to the agreement between Hunt and Wright, and probably subsequent to the refusal of the latter to accept Hunt's order, although it antedates such refusal; and that he took such assignment with notice of Wright's purchase. The prayer of the petitioner is denied.