FARMERS' LOAN & TRUST CO. v. OREGON & W. T. R. CO. (HUNT, Intervener.)

(Circuit Court, D. Oregon. April 22, 1895.)

No. 1,896.

1. PAYMENT—WHAT CONSTITUTES—PURCHASE OR DISCHARGE OF COUPONS.
Bonds of a railroad were issued to a construction company, and by it turned over to intervener under a contract with him for the construction of the road. Intervener was the president and manager of the railroad company, and held practically all its stock. He sold the bonds from time to time to obtain money for construction, part of the price being retained in each instance by the purchaser to pay matured and maturing coupons. Coupons on bonds held by intervener were carried by him. Subsequently, under a contract which was practically a sale of the road free from all indebtedness, all remaining bonds were sold to the purchaser of the former bonds. *Held*, that the coupons so "carried" or to pay which money was retained out of the price were discharged, not purchased, and intervener was not entitled to share, as the holder of them, in the proceeds of a foreclosure.

2. ESTOPPEL—BY PLEADINGS—INCONSISTENT POSITIONS.
On intervention in a railroad bond foreclosure suit, the principal bondholder is not estopped to claim that the contract under which the bonds were acquired was in effect a purchase of the road, by a sworn answer filed by him in an intervention by another party, where the same question became material, denying that he ever became owner of the franchises and properties involved, or interested therein otherwise than by purchase of bonds and stocks.

In Equity. Bill by the Farmers' Loan & Trust Company against the Oregon & Washington Territory Railroad Company to foreclose a mortgage. George W. Hunt intervenes. Petition denied.

C. E. S. Wood, for intervener.
L. L. McArthur, for respondent Wright.

BELLINGER, District Judge. The petition of George W. Hunt prays that he may be allowed to share in the proceeds of the sale which has been had, on foreclosure, of the Oregon & Washington Territory Railroad. He claims as the owner of coupons of the value or amount of $233,340, originally belonging to the bonds secured by the mortgage for the foreclosure of which this suit was brought. The Oregon & Washington Territory Railroad originated with the people of Pendleton, Or., who organized a company, and procured money by subscription, to inaugurate the building of a line from Pendleton to Wallula Junction. Hunt became the contractor to build the road. Soon thereafter the enterprise was, in

effect, turned over to him.   He became the owner of four-fifths of the stock of the company, and also its vice president and general manager.   C. B. Wright was a large stockholder in the Northern Pacific Railroad, and was interested in the construction of the proposed road, since it was to connect with the Northern Pacific road.   In 1889 Hunt applied to Wright for money to carry forward the enterprise which he had assumed, with the result that the latter purchased at different times, during the early part of 1888, 942 bonds, of the par value of $1,000 each, being all of an issue on what is known as the "Pendleton Division Issue," excepting 400, which were sold in equal amounts to W. S. Ladd and to one Tower, the total of such issue being 1,142.   At the time Wright made the second purchase of bonds, 400 in number, he deducted and retained from the purchase price to be paid $60,000, to pay the July interest on a prior purchase of 400 bonds, and the installment of coupons of the 800 bonds to mature on the first days of the succeeding January and July.   Wright allowed Hunt interest upon the amount retained by him to pay coupons not then due.   The same course, as to retaining money to pay coupons not yet due, was adopted with reference to the bonds purchased by Ladd and Tower.   Subsequently there was a further issue of bonds upon an extension of the road, of which Wright purchased 142.   There was a third issue, of what is known as the "Consolidated Mortgage Bonds," intended to be exchanged for the bonds already issued.   At the time of the last two issues, Hunt was president and manager of the company and the holder of four-fifths or nineteen-twentieths of its stock.   All these several issues of bonds were received by Hunt, in the first instance, as the representative of the railroad company, and were by him, as he claims, delivered to the construction company, in compliance with the railroad company's contract with such company; and thereupon the construction company turned them over to Hunt, to pay for construction by him under his contract with the latter company.   He contends that the deductions made by Wright and Ladd from the purchase price of bonds bought by them from him to pay interest upon coupons not yet matured was, in effect, a payment by him of such interest, and that he is thereby in the position of a lienholder against the property mortgaged to secure the bonds to which the coupons belonged.   These coupons were passed through the Farmers' Loan & Trust Company, and were canceled.   A part of the coupons for which Hunt makes claim in this proceeding belonged to bonds held by Hunt, who says that he paid these coupons thus belonging to him; that he paid them by "carrying" them, by the fact that as fast as they matured they became enforceable liens in his hands against the road.   All bonds not already owned by Wright at the time were subsequently, on February 27, 1891, sold by Hunt to Wright, the matured coupons having been in the meantime detached and punched.   Hunt testifies that he was compelled to pay these coupons by allowing future interest to be deducted from the purchase price of the bonds sold, and by detaching and canceling the matured coupons upon the bonds held by him, in order to protect his interest in the company's property.   On Febru-

ary 27, 1891, Hunt and Wright entered into the following agree- ment:

"Philadelphia, Pa., Feb. 27, 1891.

"It is hereby agreed between C. B. Wright, of Philadelphia, Pa., and G. W. Hunt, of Walla Walla, Wash., as follows: The said Hunt agrees to deliver, and the said Wright to take, all of the issue of bonds of the Oregon & Washington Territory R. R. Co. (except 1,142 bonds of the first issue on the Pendleton Division, already sold), at 90 per cent. of their par value, at $20,000 per mile, or at a purchase price of $18,000 per mile. There are said to be 111 miles of said road, but the exact mileage shall be determined by actual measurement, by two competent parties, one to be selected by each of the parties to this contract. If said road is not in a fair and reasonable good condition, according to the standard of western railroads, the said Hunt agrees to put it in such a condition, to the reasonable satisfaction of the president and chief engineer of the Northern Pacific, at his own expense. This provision applies only to roadbed, not to stations or other improvements. The said Hunt further agrees to deliver to said Wright, without additional compensation, 51 per cent. of the capital stock of said corporation. It is further agreed that said Hunt shall be paid for all the rolling stock of said corporation, or of said Hunt, and used by said corporation, an additional sum, to be determined by T. F. Oakes, president of the N. P. R. R., and G. W. Hunt; also that the said Hunt shall be allowed to build and complete, ready for the rolling stock, about 42 miles of extension of said road, as follows:

"About 18 miles to the Snake river.
"     12  "   to the near Conalle.
"     12  "   to the near Milton.

—All in Washington and Oregon, whenever the same shall be built, and at such price as may be agreed on with the said T. F. Oakes. The terms of payment to be as follows: $75,000 cash, which immediate payment shall be further secured by said Hunt pledging with said Wright, as collateral security, until the second payment is made, all the capital stock of said corporation remaining and belonging to said Hunt, over and above the 51 per cent. aforesaid.

"$800,000 to be paid on Friday, April 17th, 1891.
"$300,000  "   "   "   "  July 1st, 1891.
"$400,000  "   "   "   "  September 1st, 1891.

—And the balance on December 1st 1891. Deferred payments to draw interest at 6 per cent. It is further agreed that said road shall be delivered clear and free of floating (or unsecured) indebtedness, and that the said Hunt, as president of said corporation, shall lend his best efforts and his time to the reorganization of said corporation, as the said Wright or his successors shall direct.                                  C. B. Wright.    [Seal.]
                                                 "G. W. Hunt.     [Seal.]
                                                 "C. B. Wright.

"In the presence of
  "C. E. S. Wood,
  "C. B. Wright, Jr."

Wright has made all the payments provided for in this agreement, and has paid in addition thereto above $230,000 in settlement of floating debts of the road. The foreclosure sale that has taken place has been in his interest. He purchased the property at such sale in extinguishment of his liens, so that any payment decreed to Hunt on this petition will be, in effect, at Wright's expense. If what Hunt did amounts to payment of coupons of outstanding bonds of the company, he is not entitled to be subrogated to the rights of the original holder of the coupons so paid. What he did was intended to have the appearance and effect of payments made by the debtor company, and was for the purpose of advancing or sustaining its credit in the market. He was the absolute manager

of the company, and was practically the only person beneficially interested in it. It had become his enterprise, and a default in the payment of interest would have brought on a foreclosure of the mortgage, and would have been ruinous to him. It was to the interest of the bondholders that the coupons should be paid, not purchased and held for future payment. To sustain the intervener's claim, it must appear that the payment of coupons by him was upon a distinct understanding with the holders of the bonds to which the coupons belonged that such coupons were purchased, not discharged. Otherwise the accumulation of interest would impair the security of such bondholders, and work a fraud upon them. Hunt's relations to the property were such that its earnings came into his hands. Prior to the agreement of February 27, 1891, he caused a statement of its earnings to be made and placed in the hands of an official of the Northern Pacific Railroad, from which it appeared that such earnings were enough to pay operating expenses, and interest on its indebtedness. This statement, or its substance, would naturally come to Wright's knowledge, from his relation with the Northern Pacific Railroad. Its intent and effect are obvious. Moreover, it is suggestive of the fact that the earnings were enough to meet the requirements of the road, as represented. In any event, Hunt ought, in good conscience, to have shown what the fact is as to this,—what he received as president, manager, and stockholder of the company, and the application made of such receipts.

On the intervention of Congdon in this case (58 Fed. 640), I considered the effect of the agreement between Wright and Hunt, of February 27, 1891, and concluded that this agreement was, in effect, a purchase by Wright from Hunt of the road in question, free from all indebtedness. I am still of that opinion. Wright testifies that the agreement was the result of a conference between the parties at his home, in Philadelphia, where he was visited by Hunt and Mr. Wood, Hunt's attorney; that the latter introduced the subject of the agreement with the statement:

"Now, Mr. Wright, we have come here to sell you this road. We have got to the end of our string, and we have got a large amount of money to raise on Monday. Mr. Hunt has been called upon for a large amount of money payable on Monday,—the first of March, he said,—and we want to sell you this road."

He testifies that in pursuance of this offer the contract in question was entered into, and the road taken possession of by him. This testimony is not contradicted. But, without this testimony, the written agreement of the parties clearly shows that the contract was, in effect, one of sale and purchase. Wright bought all the bonds and 51 per cent. of the stock of the company; provided for all the floating indebtedness, for the purchase of the rolling stock, and for the construction of 42 miles of extension of the road, to be paid for at such price as should be agreed upon between Hunt and T. F. Oakes, president of the Northern Pacific Railroad Company. The provisions in the agreement as to such construction, that "Hunt shall be allowed to build and complete forty-two miles"

of extensions to specified points, "at such price as may be agreed upon with the said T. F. Oakes"; the language of the bond-purchase provision, that Wright is to take all of the issue of bonds, etc., "at 90 per cent. of the par value, at $20,000 per mile, or at a purchase price of $18,000 per mile"; and the provision for ascertaining the exact mileage of the road by a disinterested measurement; and the further provision that Hunt is to put the road in a good condition, to the reasonable satisfaction of said Oakes or the chief engineer of the Northern Pacific Railroad Company,—are all conditions of purchase, rather than conditions of security. Hunt's agreement "to put the road in a good condition" can only refer to a change of ownership in fact, whatever the form of ownership might be; otherwise it must be supposed that Hunt would be required, not only to put the road in a good condition, but to keep it in such condition. Nor is this all. The agreement provides that Hunt shall deliver the road, free and clear of floating or unsecured indebtedness (Wright had taken up, by the agreement, the bonded debt), and shall aid in such reorganization of the company as Wright or his successors shall direct. Under this agreement, Wright took actual, formal possession of the road, sending his son and an accountant to this country for that purpose

It is in evidence (for the admission of which the case was reopened after it had been submitted) that Wright, in an answer filed in this court to the petition of W. M. Ladd and others, in a proceeding where the question became a material one, denied that he ever became, in fact or at all, the owner of the franchises or properties of the Oregon & Washington Territory Railroad Company, or interested in them in any other way than by the purchase of bonds and stocks. This answer was sworn to by Wright, and filed after the adjudication in the Congdon intervention, where it was decided in favor of Wright's contention that he did, in effect, become the purchaser of the road free from all indebtedness, and that the purchase by him of bonds and stocks on February 27, 1891, was merely a means to that end, and after this cause had been submitted here upon his like contention, supported by his own oath and the argument of his lawyers. It was to his interest, in the Ladd petition, that his relation to the road should be held to be merely that of stockholder and creditor, and his oath therein is according to that interest. His interest in the Congdon intervention and in this intervention is the other way. In this case, as in the Congdon Case, he makes it clear that Hunt came to him with a proposition to sell the road, and that it was upon that basis that the contract was made, and he testifies that he took possession of the road. I am not authorized to punish Wright for his oath on the Ladd petition by a judgment in this case that is contrary to the judgment rendered by me in the Congdon intervention, and to my present convictions of the truth of the matter to be determined. There is no room for an estoppel. The question for decision rests upon a written contract of the parties, and upon what was done under that contract, and is not open to doubt. The prayer of the petition is denied.